CAHILL GAMBINO LLP
60 Railroad Place, Suite 202
Saratoga Springs, New York 12866
(518) 584-1991
Daniel S. Cahill  (DC - 5593)
Attorneys for Nomura Holding America Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
NOMURA HOLDING AMERICA INC.,     :
     :
          Plaintiff,     :    COMPLAINT
     :
     - against -     :
     :
ALLIANZ GLOBAL RISKS US INSURANCE    :    JURY TRIAL DEMANDED
COMPANY,     :
          Defendant.    :
----------------------------------------------------------- X

     Plaintiff Nomura Holding America Inc., for its complaint against Allianz Global Risks US Insurance Company, pleads and alleges as follows:

## THE PARTIES

     1.     Plaintiff Nomura Holding America Inc. ("Nomura" or "Plaintiff"), is a Delaware corporation with its principal place of business in New York.  During the relevant time period, Nomura's headquarters were located at 2 World Financial Center in lower Manhattan (the "WFC Offices").

     2.     Upon information and belief, Defendant Allianz Global Risks US Insurance Company ("Allianz" or "Defendant") is a California corporation with its principal place of business at 2350 Empire Avenue, Burbank, California 91510-7780.

     3.     At all relevant times hereto Allianz provided insurance coverage to Nomura pursuant to a "Commercial Lines Policy," Policy No. CLP3012948 (the "Policy"), attached

hereto as Exhibit 1.   The Policy was issued to Nomura in New York.  Nomura paid Allianz a premium of $873,914 for coverage for the period December 8, 2011 to December 8, 2012.

## JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

5.      The amount in controversy exceeds $75,000.

6.      Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and pursuant to 28 U.S.C. §1391(c) – (d), Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Southern District of New York.

## THE NATURE OF THE ACTION

7.      This action is brought pursuant to 28 U.S.C. §2201, as well as the laws of the State of New York, in connection with Nomura's insurance claim under the Policy, with respect to losses resulting from Hurricane Sandy.

8.      Hurricane Sandy was the second-costliest hurricane in United States history and struck New York City on October 29, 2012, flooding streets, tunnels and subway lines and cutting power in and around the city.  Preparations for Hurricane Sandy's impact began in the preceding days.  On October 28, 2012, New York's Governor announced that all public transportation to lower Manhattan would be shut down beginning that evening, President Obama declared a state of emergency in New York and New York City's Mayor signed an executive order, ordering the evacuation of (among other areas) Battery Park and Nomura's WFC Offices.

9.      The storm surge during the high tide in New York Harbor reached nearly 14 feet in Battery Park and other parts of New York City.  Sewers and storm drains were overwhelmed, and some buildings in lower Manhattan and elsewhere in New York City took on millions of gallons of water.

10.     Despite precautionary measures, Hurricane Sandy disabled transportation systems, electricity and telecommunication systems.  With local and regional transportation networks severely compromised, access to lower Manhattan as well as other parts of the city was extremely limited in the days following the storm.  Damage from flooding disabled much of the city's subway system including the South Ferry Terminal, as well as the PATH, the Holland Tunnel, and the Hugh L. Carey Tunnel.  High Occupancy Vehicle restrictions were put in place on the Brooklyn Bridge, and ferry service was limited.  Service was suspended on commuter rail lines in much of New York, New Jersey and Connecticut.

11.     At the time Hurricane Sandy struck Manhattan, the WFC Offices housed the vast majority of Nomura's employees in North America, including more than 1,500 people encompassing its capital markets, broker-dealer, and asset management operations.  Nomura began its preparations for Hurricane Sandy in advance of the storm, and took prudent precautions to protect its employees, its property and its business.

12.     On October 29, 2012, Con Edison announced that the electricity at the WFC Offices would be shut down.  Nomura started its emergency generator system at the WFC Offices but the system was overwhelmed by the impact of the storm and could not function. Indeed, flooding at the WFC Offices reached floor levels C, C1, C2 and C3, which were occupied by Nomura.

13.     On or about November 6-7, 2012, Nomura was able to gain access to the WFC

Offices to assess the situation and begin replacing damaged critical systems.

14.     On November 9, 2012, Nomura completed the replacement of damaged critical

equipment and successfully tested such equipment by the end of the day.  This same day, the

Queens-Midtown Tunnel re-opened one lane for rush-hour bus service only.  Also, New York

City, Suffolk County and Nassau County imposed "odd-even" gasoline rationing to address the

gasoline shortage and ease congestion and frustration at gas stations.

15.     On November 12, 2012, Nomura resumed operations at the WFC Offices.

16.     Nomura suffered over $2 million of property damage arising from Hurricane

Sandy, and separately incurred over $2 million of additional expenses to continue its operations

throughout the period it was unable to use its offices.  Nomura went to great lengths to ensure

that it returned to its WFC Offices as quickly as possible and took reasonable steps to limit its

losses by resuming normal operations as quickly as it could consistent with employee safety.

Through such efforts, Nomura greatly mitigated its losses and resulting claim.

17.     As detailed below, Nomura has made a claim under the insurance policy issued by

Allianz to recover a portion of the expenses it incurred as a result of Hurricane Sandy, but

Allianz has engaged in a course of conduct designed to delay resolution, impose unwarranted

demands and deny payment.

## FACTUAL BACKGROUND

### A.  **The Insurance Policy at Issue**

18.     The Commercial Lines Policy at issue provides broad coverage of up to

$325,000,000 -- subject to various sublimits -- to Nomura (and its subsidiaries) against a wide

range of perils for the period of December 8, 2011, to December 8, 2012.  The perils insured

against include "Named Windstorm," including Hurricane Sandy.  Specifically, the Policy

defines "Named Windstorm" as a storm or weather condition that:

    **(a)**    **has sustained wind speeds of at least thirty-nine (39) miles per hour; and**

    **(b)**    **has been declared by the United States Weather Service, the World Meteorological Organization Regional Specialized Meteorological Center (RSMC) or Tropical Cyclone Warning Center (TCWC) having regional responsibility, or any governmental agency or body having the authority to make such declarations, to be a hurricane, typhoon, tropical storm or cyclone.**

**Such storm or weather condition is considered a "named windstorm":**

    **(i)**    **during the period of time that conditions (a) and (b) above are met; and**

    **(ii)**    **during the *seventy-two (72) hours immediately preceding* the time when conditions (a) and (b) above are first met; and**

    **(iii)**    **during the seventy-two (72) hours immediately following the time when such storm or weather condition has been downgraded.**

See Ex. 1, pp. 24-25 (emphasis added).

19.    The two major types of coverage under the Policy are denominated "Property"

and "Time Element."   The Property covered by the Policy includes all real property in which the

Insured has an interest as well as all personal property owned by the Insured and the Insured's

officers and employees (subject to a number of specific exclusions not relevant here).  See Ex. 1,

pg. 16.

20.    The Time Element Coverages language of Allianz's Policy provides six different

forms of coverage applicable to different kinds of losses, including: 1) Commission, Profits and

Royalties; 2) Extra Expense; 3) Gross Earnings; 4) Gross Profits; 5) Leasehold Interest; and 6)

Rental Insurance.  See Ex. 1 pp. 44-49.  Nomura, however, did not purchase all of these

coverages (notably Allianz did not insure Nomura's Gross Earnings or Gross Profits).  See Ex. 1,

pg. 11.  Indeed, the only claim Nomura has submitted is for Extra Expense.

21.     The Extra Expense provision under the Policy is a mitigation clause, and provides

as follows:

> **a.     The recoverable EXTRA EXPENSE loss is the reasonable and necessary extra costs incurred by the Insured during the PERIOD OF LIABILITY as respects the following:**
>
> > **(1)     extra costs to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and**
> >
> > **(2)     extra costs of temporarily using property or facilities of the Insured or of others; less any value remaining at the end of the PERIOD OF LIABILITY for any property obtained in connection with the above.**
>
> **b.     No coverage is provided herein for:**
>
> > **(1)     any loss of income;**
> >
> > **(2)     costs that normally would have been incurred in conducting the Insured's business during the same period had no physical loss or damage not otherwise excluded by this "policy" to Insured Property occurred;**
> >
> > **(3)     cost of permanent repair or replacement of any property that has been destroyed or damaged; or**
> >
> > **(4)     any expense recoverable elsewhere in this "policy".**

See Ex. 1, pg. 45.

22.     The standard Policy form specifies "deductibles" applicable to the various

coverages it provides and pays for covered loss greater than the deductible.  With respect to loss

arising from a named windstorm, the deductible under the Policy is described as follows:

> **2% applies *separately* to (A) and (B) below:**
>
> **(A) of the value, per VALUATION, of the Insured Property (including foundations) at the "location" where the physical loss or damage occurred. This PROPERTY DAMAGE deductible applies separately at each "location" irrespective of any other deductibles applying.**
>
> **(B) of the full 12 months TIME ELEMENT values that would have been earned**

**in the 12-month period following the "occurrence" by use of the facilities at the "location" where the physical loss or damage occurred and of the full 12 months TIME ELEMENT values at all other "locations" where the TIME ELEMENT loss ensues. This TIME ELEMENT deductible applies separately at each "location" irrespective of any other deductibles applying.**

**The combined deductible for PROPERTY DAMAGE and TIME ELEMENT is subject to a minimum of $250,000 per "occurrence".**

See Ex. 1, pg. 14.

23.     Other than the reference to the $250,000 minimum combined deductible (which minimum applies to all Property Damage and Time Element coverages), the remaining deductible language for Time Element set forth above only applies to coverage for Gross Earnings and Gross Profits (and not Extra Expense), as it is structured to limit covered losses to the *shortfall* from the Insured's normal operation due to the peril.  The coverage for Extra Expense, by contrast, already defines "extra" by excluding any loss of income as well as "costs that normally would have been incurred in conducting the Insured's business during the same period" had no physical loss or damage occurred.  Extra Expense coverage is intended to cover costs expended to mitigate other losses, a conclusion buttressed by the fact that Nomura was never required to report any base "value" as is required for other Time Element coverages.  Ex. 1, pg. 52.  Also, and in any event, Extra Expenses (*i.e.* mitigation expenses) by definition are not "values that would have been earned."  Ex. 1, pg. 14.  As such, the deductible for Extra Expense is $250,000 (*i.e.* the minimum deductible).

### B.  Nomura's Mitigation of Its Losses- Extra Expense

24.     Nomura's efforts to protect its assets and resume operations at the WFC Offices as quickly as it did (in less than 2 weeks) greatly mitigated the resulting damages Nomura suffered and, ultimately, the size of its claim under the Policy.

25.     During the two week period that Nomura was prevented from using the WFC Offices, it temporarily continued its business operations through several strategies, including:

- <u>Nomura Used Existing Office Space at Other Locations</u>.  As office space in New York City was at a premium, Nomura utilized existing office space that it already leased in unaffected, satellite locations (such as Rye Brook, Houston, Chicago and San Francisco).  This was done to mitigate expenses related to procuring office space and related expense, as well as to deal with capacity restraints at the New York locations; and

- <u>Nomura Procured Temporary Office Space</u>.  During the loss period, Nomura procured additional office space at certain New York City hotels.  Nomura also procured additional office space at its pre-existing location in Rye Brook, NY.

26.     In connection with those strategies Nomura incurred various expenses to get employees to those locations and allow them to work away from home, primarily in the following categories: travel (including flights and taxi); hotels in other cities and in New York; and meals for employees in hotels or for employees at the temporary locations.

**C.  The Claim Process**

27.     On October 31, 2012, while still barred from its WFC Offices, Nomura reached out to Allianz's agent, VeriClaim, to alert the Insurer that it expected to make a claim under its Policy.  The Policy had been procured with the assistance of insurance broker Marsh USA, Inc. ("Marsh").  During the period surrounding Hurricane Sandy and the claims related to it, Marsh continued to act as an intermediary between Allianz and Nomura.

28.     During the course of Nomura's initial communications with Allianz, it was told by VeriClaim to simply provide a schedule of loss information with respect to its claims. Nomura complied as promptly as possible.

29.     In January 2013, however, Allianz/VeriClaim reversed its previous oral instruction and indicated that, rather than general information, it needed detailed back-up information from Nomura on all expenses.  Again, Nomura promptly complied and provided documentation to substantiate all of its claimed expenses.

30.     In early 2013, Nomura provided Allianz/VeriClaim with several volumes of documentation for: (i) a property damage claim, and (ii) the Extra Expense claim.  The claims were carefully organized and broken into four components, each supported and backed up by spreadsheets with the entries tied to hundreds of pages of receipts and invoices, all of which were provided to Allianz and its agents.

### D.  <u>The Property Damage Deductible Swallows the Property Damage</u>

31.     The proposed claim for "Property Damage" totaled approximately $2.1 million.

32.     Marsh conveyed to Nomura that Allianz's view of the "Named Windstorm" coverage and applicable deductible for "Property Damage" coverage was 2% of the valuation of all insured property at the WFC Offices (approximately $250 million).  Thus, the Property Damage deductible, in Allianz's view, would be approximately $5 million, which would far exceed the approximate $2.1 million Property Damage claimed.

33.     Nomura was advised by Allianz and Marsh to simply put that claim aside and seek an expeditious resolution of the "Time Element – Extra Expense" claim.  Nomura accepted such determination in good faith and proceeded with its Time Element claim.

9

### E.  **The Extra Expense Claim**

34.     Nomura prepared its detailed Extra Expense claim reflecting costs it had incurred to maintain business "as nearly normal as practicable."  The total amount of such expenses was $2,266,855.44.  In accordance with the terms of the Policy, Nomura deducted from its claim savings that occurred as a result of the occurrence -- the largest of which was a rent abatement that Nomura secured from the landlord of the WFC Offices, which with several other savings, totaled approximately $889,625.  Taking such offsets into account the Extra Expense mitigation claim, as submitted to Allianz, was for approximately $1,377,230.44, which minus a deductible of $250,000, sought payment of $1,127,230.44.

35.     In 2013, Allianz appointed the accounting firm Matson Driscoll & Damico LLP ("MDD") to act as its agent (in addition to VeriClaim) in connection with Nomura's claims.

36.     Using the components and back-up materials provided by Nomura, MDD generated its own loss schedules (the "MDD Schedules").  The MDD Schedules are effectively an itemized list of the receipts provided by Nomura, totaling approximately 150 pages.

37.     Throughout 2013 and 2014, in response to requests from Allianz and MDD, Nomura continued to provide additional copies of invoices, receipts and documentation – ostensibly to help resolve MDD's alleged questions concerning the Extra Expense losses.  For example, Nomura at the request/demand of MDD went back to interview employees concerning items such as meal charges and taxi receipts.  Nomura provided Defendant and MDD with such requested information including, inter alia expense information concerning rent, cafeteria costs, electricity costs, water costs, janitorial and security services.

38.     Also, notwithstanding that Nomura was making no claim for lost Gross Earnings or lost Gross Profits, MDD requested monthly Profit and Loss statements ("P&L") for Nomura,

again ostensibly to verify certain expenses.  While Nomura did not, and does not, have or create monthly P&L statements, it did have quarterly P&L statements and provided such statements to MDD in October 2013.

39.     None of the information requested or provided resulted in MDD reaching any conclusions.  MDD engaged in a process of repeatedly asking for more information and further clarification (including tax returns, despite Nomura's Extra Expense claim not being a business interruption claim).  Moreover, while Nomura provided nearly all the requested information (and has otherwise substantiated all of its claimed amounts for Allianz), on numerous occasions Allianz (through MDD) (i) re-requested information or invoices (for hundreds of thousands of dollars) which already had been provided by Nomura months previously, and/or (ii) claimed information that had been provided was now missing from MDD's files and consequently needed to be re-sent before MDD could modify the MDD Schedules.  Then when such information was again provided, MDD would often fail to amend the MDD Schedules to reflect such information.

40.     Initially (and persistently thereafter) the MDD Schedules held losses "for discussion" and/or did not ever agree with or reject well over $1 million of Nomura's Extra Expense claims.  Regardless of Nomura's cooperation, MDD consistently failed to reflect on the MDD Schedules information provided to it by Nomura, or MDD simply listed the amount and held the losses in insurance limbo.  Despite having provided thousands of pages of receipts and back up, MDD always determined that all claims were subject to "discussion" and the amount Allianz owed to Nomura for the Extra Expense was approximately $0.

41.     While Nomura has repeatedly attempted to meet with and cooperate with MDD/Allianz, it eventually became clear that MDD was engaged in a persistent and

11

unreasonable pattern of requesting additional information when it was seemingly unnecessary or non-existent.  For example, as discussed above, MDD requested monthly P&L statements that do not exist, as Nomura only produces quarterly P&L statements (copies of which were provided to MDD).  Defendant then used Nomura's inability to provide non-existent documentation to argue that Nomura is not sufficiently cooperating and, therefore, the claims could not be properly processed.  See Exhibit 2.

42. Allianz solely relies on Section V.C.8. "REQUIREMENTS IN CASE OF LOSS" to make such argument, which Section states in relevant part:

> **f.** **as often as may be reasonably required:**
>
> **(1)** **exhibit to any person designated by the Company all that remains of any property;**
>
> **(2)** **submit to examination under oath by any person designated by the Company and sign the written records of examinations; and**
>
> **(3)** **produce for examination at the request of the Company:**
>
> **(a)** **all books of accounts, business records, bills, invoices and other vouchers; or**
>
> **(b)** **certified copies of (a) above if originals are lost;**
>
> **at such reasonable time and place as may be designated by the Company or its representative and permit extracts and machine copies thereof to be made.**

See Ex. 1, pg. 61.

43. Nomura has fully cooperated with all of Allianz's and its agents' reasonable requests for over two years.

44. Nowhere in such Section V.C.8 of the Policy does it state that Nomura must create new business documentation (such as monthly P&L statements) solely to satisfy a checklist created by Allianz.  Yet, Allianz/MDD is effectively asserting as much and using it as a delaying tactic.

45.     Other persistent tactics employed by MDD and Allianz include ignoring information and apparent agreements as well as the manipulation of the information provided – such that the net amount that Allianz would owe to Nomura for the Extra Expense would always be approximately $0.  For example, MDD calculated that Nomura allegedly "saved" $53,704 by not having electricity at the WFC Offices from October 29-31, 2012.  Consequently, MDD reduced the Extra Expense claim by $53,704 on the MDD Schedules.  Nomura's actual electric bill for October 1-28, 2012 that was provided to MDD, however, was only $85,398.  Given that the invoice for 28 days of October was $85,398, MDD's theory that the savings for 3 days was $53,704 is unsupported and unreasonable.  Similarly, after MDD initially accepted $22,992 of $53,144 in meal expenses as part of its May 2014 iteration of the MDD Schedules, as part of the March 2015 iteration of the MDD Schedules MDD changed this figure to $0 and has identified the entire $53,144 as held for discussion – despite the fact that there was no change in information concerning such expenses.

46.     In July 2014, Nomura met with MDD in an attempt to resolve and clarify any remaining questions or misunderstanding concerning the Hurricane Sandy expenses.  Among the issues addressed was MDD's position (described above) that Nomura would have incurred electricity charges comprising nearly 40% of its October bill, in the last three (3) days of October.  During the meeting, MDD appeared to appreciate the unreasonableness of that position (as well as a number of others) and indicated it would modify the MDD Schedules accordingly.

47.     MDD, however, took no action in that regard for months.  After approximately five (5) months (on or about December 19, 2014) the next iteration of MDD's Schedules was sent to Nomura.  The July 2014 meeting appeared to have been a wasted effort, as MDD did not reflect the apparent agreements and concessions made in July and essentially reasserted the same

position on its Schedules in December 2014 as it had previously.  For example, MDD's assertion that Nomura saved $53,704 in electricity from October 29 – 31, 2012 was still reflected.

48.     More than two years after Hurricane Sandy, Allianz and its agents still had made no payment (not even an interim payment) to Nomura pursuant to the Policy.

**F.  Allianz's 2015 New Position Concerning Extra Expenses and Deductible**

49.     In the first quarter of 2015 (and for the first time in the 2 year process), Allianz's agents indicated on a conference call that, in Allianz's view, the "Named Windstorm" deductible for "Extra Expense" coverage was not the $250,000 minimum.  Rather, Allianz's view (as indicated by its agents) is that the deductible was a calculation based on income, namely 2% of the "12 months of TIME ELEMENT values that would have been earned in the 12 month period following the occurrence by use of the facilities at the location where the physical loss or damage occurred."  See Ex. 1, p. 14.   Further, as indicated by Allianz's agents, the "TIME ELEMENT values" likely meant (in Allianz's new view) Nomura's 12-month gross revenues for the WFC offices.

50.     Such new interpretation by Allianz of the Named Windstorm deductible for the Extra Expense claim is incorrect and violates basic precepts of New York law.  In the event an insured did not purchase the Time-Element's income-based coverages for "Gross Earnings" or "Gross Profits" (which Nomura did <u>not</u> purchase), such interpretation would render the Extra Expense coverage illusory.  A deductible calculated as a percentage is intended to make sure that the insured shares in a portion of the covered loss -- where a company insures its "Gross Earnings" or "Gross Profits" the insured must assume a part of the risk of shortfall from the normal values that is caused by the peril.  Where there is no insurance coverage for a shortfall from normal Gross Earnings or Gross Profits, using any measure of earnings as a "deductible"

14

makes recovery of extra expense impossible as a practical matter.  Allianz and its agents knew

that any attempt to use an income-based deductible would set the deductible in the tens of

millions of dollars -- far above any reasonable mitigation  expenses.  Moreover, Allianz's new

deductible interpretation not only renders the supposed Extra Expense coverage illusory, but also

renders the 2 years of collecting receipts, tabulating invoices and holding meetings and

teleconferences entirely futile and an exercise in bad faith by Allianz.

     51.    Nomura, as well as the Marsh representatives on the call, strenuously objected

that the income-related deductible provision was never intended to apply to the "Extra Expense"

mitigation coverage provision.  As an initial matter, Extra Expenses specifically exclude

coverage for loss of income.  As a result, the language of "12 months of TIME ELEMENT

values that would have been earned" cannot apply to Extra Expense coverage because 12 months

of [Extra Expense] values "that would have been earned" is zero.  Mitigation costs cannot be

earned.  The income-based language is plainly meant to apply to the income-based coverages

under the Time Element provision, *not* the non-income based mitigation coverage (*i.e.* Extra

Expense).  In addition, Nomura had never reported (and was never asked to report) "Time

Element values" as required for other coverages under the Policy and specifically referenced in

the Policy language cited by Allianz.

     52.    The consequences of Allianz's interpretation of the deductible and MDD's actions

and/or inaction on processing the claim were such that Nomura would neither obtain a decision

concerning its claim nor the benefits it contracted for under the Policy.

     53.    Consequently on March 13, 2015 Nomura sent Allianz a letter seeking

"Appraisal" under the Policy, Section V(C)(2).  See Ex. 1, p. 59.

54.     The "Appraisal" provision provides, among other things, that "[i]f the Insured and the Company fail to agree on the amount of loss, each will, upon the written demand of the other, select a competent and disinterested appraiser" to appraise the loss.  Id.  Following such appraisals, "[i]f the appraisers fail to agree, they will submit their differences to the umpire" who was selected by the appraisers at the outset of the appraisal process and "[a]n award agreed to in writing by any two will determine the amount of loss."  Id.

55.     Allianz responded to Nomura's written demand for appraisal on March 27, 2015, with its refusal to comply with the Appraisal process under the Policy's Section V(C)(2), stating that the appraisal demand was "premature" and that the "scope of coverage provided by the Policy, including the application of the deductible, is not subject to appraisal."  See Ex. 2.

56.     Consequently, by refusing to engage in the Policy's Appraisal process and contending that Appraisal process cannot apply to any dispute concerning the terms of the Policy, Allianz seeks to render the Policy meaningless with no avenue for recourse.  For example, in the Schedules MDD prepared it indicated that certain costs (such as a hotel bill for a Sunday night, so a displaced employee could work on Monday) were ostensibly not "covered," or indicated that over $520,000 of costs were "potential" Property Damage, thus raising an issue (in Allianz's opinion) about coverage rather than amount and not subject to Appraisal.

57.     Allianz also confirmed its new position that rather than apply $250,000 as the Named Windstorm deductible for the "Extra Expense" it intended to use "2% of the full 12 months Time Element values that would have been earned in the 12 month period following the occurrence by use of the facilities at the location where the physical loss or damaged occurred."  See Ex. 2.  In its March 27 letter, Allianz did not even attempt to explain how earnings could

apply to the Extra Expenses coverage or what "Reported Value" it could use for such an exercise.

58.     Moreover, on April 2, 2015, Allianz went on to contend that (despite being provided with thousands of pages of receipts, invoices and claim substantiation) Nomura had not complied with the proof of loss condition in the Policy, *and*  that (in any event) Allianz "would not have accepted any proof of loss submitted" but also indicated it was "extending the time for Nomura to submit a signed proof of loss until June 2, 2015."  See Exhibit 3 attached hereto.

59.     Under New York law the purpose of the proof of loss is to enable the insurer to form some estimate of its rights and liabilities.  No particular form is required.

60.     Nomura, as early as the first quarter of 2013, presented to Allianz  documented claims and amounts, under specific Policy provisions, satisfying the proof of loss condition under New York law.

61.     Regardless, given Allianz's newly declared April 2, 2015, position (which was not an "extension of time" but merely was Defendant's attempt to come into compliance with *N.Y. Insurance L.* §3407) Nomura submitted a proof of loss to Allianz, in the form requested, on June 2, 2015.

62.     On June 9, 2015, however, Allianz sent a letter to Nomura purporting to reject Nomura's proof of loss.  Allianz indicated that it was extending the time for Nomura to submit a proof of loss until July 15, 2015.  See Exhibit 4 attached hereto.

63.     Plaintiff has performed all of its obligations under the Policy and satisfied all conditions of the Policy required for Appraisal as well those necessary to receive payment for its claims, except to the extent that such obligations or conditions have been excused by

Defendant's conduct as alleged herein.  Nomura has fully cooperated with all reasonable requests made by Allianz and its agents since the loss was incurred.

64.     While the Policy requires that an action be brought within twelve months after the date of loss, the parties have extended such time period multiple times, with the latest extension being June 16, 2015.

## COUNT I – DECLARATION SOUGHT

**Propriety of Declaration**

65.     Plaintiff hereby incorporates by reference Paragraphs 1 through 64, as if fully stated herein.

66.     In order to resolve this controversy Nomura requests that pursuant to 28 U.S.C. §2201, this Court declare the respective rights and obligations of the parties to this matter and in particular, that the Court declare: (i) that under the Policy, the Named Windstorm deductible for Extra Expense coverage is $250,000; and (ii) that Nomura has satisfied all its obligations under the Policy including in regard to providing proof of loss.

67.     A valid case or controversy exists sufficient for this Court to declare the rights and remedies of the parties, in that a valid insurance contract exists between Nomura and Allianz.

68.     The controversy is ripe for determination at this time because Allianz has recently declared an interpretation of the Named Windstorm deductible that is in direct conflict with the parties' dealings over the prior two years and Nomura's understanding of the deductible, and is such that the coverage ostensibly provided by the Time Element - Extra Expense coverage would be rendered meaningless and illusory in this instance.

## COUNT II – BREACH OF CONTRACT

69.     Plaintiff hereby incorporates by reference Paragraphs 1 through 68 as if fully stated herein.

70.     The Policy is a binding and enforceable contract of insurance.

71.     The Defendant, as set forth above, and in particular through its refusal to submit to the Policy's Appraisal procedure, breached the Policy.

72.     The Defendant, as set forth above, and in particular through its refusal to accept, deny and/or pay amounts substantiated and rightfully claimed by the Plaintiff under the Policy, breached the Policy.

73.     The Defendant, as set forth above, and in particular through its failure to pay the amounts owed to Plaintiff under the Policy, breached the Policy.

74.     The Defendant, as set forth above, and in particular through its actions alleged in Paragrahs 39-41 and 44-47, breached the covenant of good faith and fair dealing implied in the Policy.  Specifically, the Policy has an implied contractual obligation of the Defendant to only request information that, in good faith, is reasonably necessary to assess a claim under the Policy and then to process and use that information responsibly to timely make the required payment determinations under the Policy in good faith.  The Defendant on its own and through the actions of its agents, as set forth above, breached the implied covenant of good faith and fair dealing by, *inter alia*, engaging in a persistent pattern of noncooperation, unreasonable delays, neither accepting nor rejecting substantiated claims over a 2 year period and repeatedly requesting the same information or irrelevant information.  Consequently, Defendant breached the Policy.

75.     As a direct and proximate cause of Defendant's breach of contract, Plaintiff has been damaged as alleged above, and herein, in an amount to be proven at trial but, in any event, exceeds $75,000, exclusive of interest.

## DEMAND FOR JURY

76.     Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

i.      A declaration that under the Policy that the Named Windstorm deductible applicable to the claim by Nomura for the Time Element – Extra Expense coverage arising from losses caused by Hurricane Sandy, is $250,000;

ii.     A declaration that Nomura has satisfied its obligations under the Policy, including with respect to proof of loss;

iii.    Awarding damages to Nomura, and against Allianz, in the amount of at least $1,127,230.44, representing the amount of the Extra Expense claim, minus various abatements and a $250,000 deductible;

iv.     Pre-judgment interest;

v.      For the costs of the suit herein incurred, including reasonable attorney's fees to the extent permitted by law; and

vi.     For such other and further relief as the Court may deem proper.

Dated: June 12, 2015
       Saratoga Springs, NY

                                              CAHILL GAMBINO LLP

                                              By: *s/ Daniel S. Cahill*
                                                     Daniel S. Cahill  (DC-5593)
                                                     60 Railroad Place, Suite 202
                                                     Saratoga Springs, New York 12866
                                                     Telephone:  (518) 584-1991
                                                     Email: dan.cahill@cahillgambino.com

                                              *Attorney for Nomura Holding America Inc.*